# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

PFIZER INC., WYETH LLC, WYETH

PHARMACEUTICALS INC., and PF PRISM C.V.,

Plaintiffs,

v.

ANCHEN PHARMACEUTICALS, INC., et al.,

Defendants.

C.A. No. 12-808-SLR

(CONSOLIDATED)

PUBLIC VERSION

**DEFENDANT ROXANE LABORATORIES, INC.'S
ANSWERING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.   STATEMENT OF THE NATURE AND STATE OF THE PROCEEDINGS ..................... 1

II.  SUMMARY OF THE ARGUMENT ................................................. 2

III. STATEMENT OF FACTS ...................................................... 3

   A.   Technical Background of this Case .................................. 3

      1.   Desvenlafaxine ................................................. 3

      2.   Pharmaceutical Salts ........................................... 4

      3.   Crystals, Polymorphs, and Hydrates ............................. 4

      4.   X-Ray Powder Diffraction ("XRPD") .............................. 6

      5.   Melting Point/Endotherms ....................................... 7

   B.   The Person of Ordinary Skill in the Art with Respect to the Patents-in-Suit ................... 8

IV.  ARGUMENT ................................................................ 8

   A.   The Law of Claim Construction ...................................... 10

   B.   The '838 Patent Does Not Claim any Particular Polymorph – It Claims Compounds with Certain Properties ................................................... 11

   C.   The Term "Wherein the Compound Exhibits an X-ray Powder Diffraction Pattern Having Characteristic Peaks Expressed in Degrees 2θ" Requires Each Recited Peak Location and a Threshold Intensity ................................................... 14

   D.   The Term "± 0.2° 2θ" Is the Range from 0.20° 2θ Less than to 0.20° 2θ Greater than the Recited Position ................................................... 20

   E.   The Term "Having an X-Ray Powder Diffraction Pattern Substantially the Same as that Shown in FIG." Requires Peak Locations within ± 0.2° 2θ and Substantially the Same Intensities ................................................... 22

F.     The Term "About" Should Be Construed According to the Specification to Mean "± 1%"
       25

V.   CONCLUSION.................................................................................................................... 27

**Table of Citations**

**Page(s)**

CASES

*AFG Industries, Inc. v. Cardinal IG Co., Inc.*,
  239 F.3d 1239 (Fed. Cir. 2001)...............................................................................11

*AstraZeneca AB v. Dr. Reddy's Labs. Inc.*,
  No. 11-2317, 2013 U.S. Dist. LEXIS 62149 (D.N.J. Apr. 30, 2013)......................20

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003)...............................................................................11

*Bristol-Myers Squibb Co. v. Apotex, Inc.*,
  No. 10-5810, 2013 U.S. Dist. LEXIS 44481 (D.N.J. Mar. 28, 2013).....................24

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3dsull 1556 (Fed. Cir. 1994)...........................................................................26

*CVI/Beta Ventures, Inc. V. Tura LP*,
  112 F.3d 1146 (Fed. Cir. 1997)...............................................................................10

*Key Pharmaceuticals v. Hercon Labs Corp.*,
  161 F.3d 709 (Fed. Cir. 1998)................................................................................11

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)................................................................................................10

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)..............................................................................10, 11

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)...........................................................................26, 27

*Pall Corp. v. Hemasure Inc.*,
  181 F.3d 1305 (Fed. Cir. 1999)...............................................................................10

*Pall Corp. v. Micron Separations*,
  66 F.3d 1211 (Fed. Cir. 1995)................................................................................27

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................................10

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)...............................................................................11

*Shire LLC v. Amneal Pharm., LLC,*
  No. 11-3781, 2013 U.S. Dist. LEXIS 111773 (D.N.J. Aug. 8, 2013) ....................................24

*Southwall Techs. Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995)....................................................................................................11

*Stumbo v. Eastman Outdoors, Inc.,*
  508 F.3d 1358 (Fed. Cir. 2007)..................................................................................................20

*UCB, Inc. v. KV Pharm. Co.,*
  No. 08-223, 2009 WL 2524519 (D. Del. Aug. 18, 2009)........................................................27

*Union Water-Meter Co. v. Desper Products, Inc.,*
  101 U.S. 332 (1879)......................................................................................................10, 19, 22

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)...........................................................................................11, 22

*White v. Dunbar,*
  119 U.S. 47 (1886).......................................................................................................................13

**BOOKS CITED**

ERIC J. LIEN, REMINGTON'S PHARMACEUTICAL SCIENCES 173 (ALFONSO R. GENNARO ED.,
  MACK PUBLISHING CO. 1990) (1885). ....................................................................................17

**STATUTES, RULES, AND ADDITIONAL AUTHORITIES**

35 U.S.C. § 111..............................................................................................................................10

35 U.S.C. § 271(e)(2)........................................................................................................................1

MPEP § 2173.05(i) ........................................................................................................................18

# I.    STATEMENT OF THE NATURE AND STATE OF THE PROCEEDINGS

This is a patent infringement action brought by Plaintiffs under the Hatch-Waxman Act. 35 U.S.C. § 271(e)(2).  Defendant Roxane Laboratories, Inc. ("Roxane") filed and supplemented an Abbreviated New Drug Application to market a generic version of Pristiq®.  Pristiq is an antidepressant with the active pharmaceutical ingredient, desvenlafaxine succinate. Desvenlafaxine succinate is the active metabolite of venlafaxine.   Venlafaxine has been marketed since 1997 under the trademark Effexor®.   Pristiq was a life cycle extension drug actively marketed to replace Effexor because the patents covering Effexor were going to expire.

Roxane filed paragraph IV certifications against both of the Orange Book-listed patents for Pristiq, U.S. Patent Nos. 6,673,838 (the "'838 patent") (attached as Exhibit A) and 8,269,040 (the "'040 patent"), certifying that both patents are invalid and will not be infringed by Roxane. The '838 patent claims crystalline desvenlafaxine succinate, inherent properties of certain forms or mixtures of crystalline desvenlafaxine succinate, and a method of treating depression with desvenlafaxine succinate.  The '040 patent claims desvenlafaxine succinate hydrates.  Plaintiffs have only asserted '838 patent claims 4-11, 22, and 35 and '040 patent claims 1 and 2 against Roxane.  Only '838 patent claims 5-11 include disputed claim terms.

Fact discovery closed on December 20, 2013.  Expert reports, rebuttals, and replies have been served, and expert discovery is scheduled to close on July 17, 2014.  D.I. 271.  Trial is scheduled to commence on August 18, 2014.  A Joint Claim Construction Statement was filed on April 17, 2014 (D.I. 310), and Pfizer's Opening Claim Construction Brief (hereinafter, "D.I. 321, Pfizer Opening Brief, p. _") was filed on April 28, 2014.  D.I. 321. Roxane respectfully submits this Answering Claim Construction Brief regarding the construction of the disputed terms in the claims of the '838 patent.

Roxane's Answering Claim Construction Brief is supported by the declaration of Bernhardt L. Trout, Ph.D., (copy attached as Exhibit B), Professor of Chemical Engineering at Massachusetts Institute of Technology ("MIT").   Dr. Trout is a world renowned expert in pharmaceutical development and manufacturing areas, including pharmaceutical crystal processing, the science of homogeneous and heterogeneous crystallization, polymorphism and pseudopolymorphism, pharmaceutical and biopharmaceutical formulation, and continuous pharmaceutical manufacturing.   He has performed X-ray Powder Diffraction ("XRPD") Differential Scanning Calorimetry ("DSC"), and Single-Crystal X-ray Diffraction ("SCXRD").

His declaration explains scientific principles, the meaning of technical terms, and terms of art that appear in the '838 and '040 patents and prosecution histories, and will assist the Court in understanding how a person of ordinary skill in the field, reading these patents, would understand the terms in the claims.   His declaration will also help the Court confirm that its construed meanings are consistent with the denotation ascribed by those in the field of the art.

## II.    SUMMARY OF THE ARGUMENT

The following four '838 patent claim terms should be construed as follows:

1.    *"wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ,"* which is in '838 patent claims 5, 8, and 9, should be construed as "wherein the compound exhibits an X-ray powder diffraction pattern having a complete and unique set of peaks having the reported locations and having intensities no lower than that of the characteristic peak with the lowest intensity in the table in the '838 patent specification for that set of characteristic peaks;"

2.    *"± 0.2° 2θ"*, which is in '838 patent claims 5, 8, and 9, should be construed as "the recited peak position includes peak positions in a range from 0.20° 2θ less than the recited

position to 0.20° 2θ greater than the recited position;"

3. *"having an X-ray powder diffraction pattern substantially the same as that shown in FIG.,"* which is in '838 patent claims 7 and 11, should be construed as "having an X-ray powder diffraction pattern in which peak locations do not deviate more than ± 0.2° 2θ (as previously defined) and have substantially the same relative intensities as the peaks present in FIG.;" and

4. *"about",* which is in '838 patent claims 6 and 10, should be construed as "± 1%".

This is consistent with the claim language as understood by one of ordinary skill in the art, the '838 patent specification, and common sense, while Pfizer's proposed construction ignores all of the foregoing. Rather, Pfizer tries to transform its claims into polymorph claims, which they are not. Pfizer ignores peak intensities, a major feature of a "pattern having characteristic peaks characteristic peaks" and the single property that the '838 patent inventors used to distinguish "characteristic peaks" from other peaks. Pfizer conflates "pattern having characteristic peaks" claims 5, 8, and 9 with "substantially the same" diffractogram claims 7 and 11. Pfizer also ignores the '838 patent specification and intensities with respect to "substantially the same as," ignores basic arithmetic in construing the term ± 0.2° 2θ, and, again, ignores the '838 patent specification when construing (or avoiding construing) "about".

Pfizer's claim construction cannot be correct when it violates every pertinent claim construction canon and ignores all of the evidence.

III.    **STATEMENT OF FACTS**
    **A.    Technical Background of this Case**
        **1.    Desvenlafaxine**

Desvenlafaxine is the active metabolite of the antidepressant venlafaxine. Desvenlafaxine succinate is also known as O-desmethylvenlafaxine succinate,

desmethylvenlafaxine succinate, ODV succinate, ODV-S, ODMV succinate, 1-[2-(dimethylamino)-1-(4-hydroxyphenyl)ethyl]cyclohexanol succinate, and 1-[2-(dimethylamino)-1-(4-phenol)ethyl]cyclohexanol succinate.

## 2. Pharmaceutical Salts

Desvenlafaxine is the pure basic (or "free base") form of this compound. Exh. B, ¶ 27. A salt of a basic compound can be formed by reacting the free base (*e.g.*, desvenlafaxine) with an acid. Exh. B, ¶ 28. The salt form of a basic drug is often named by combining the names of the free base and the acid, the latter being substituted with the suffix "ate" in place of the suffix "ic". Exh. B, ¶ 30. For example, the salt, desvenlafaxine succinate, is derived from desvenlafaxine free base and succinic acid.

## 3. Crystals, Polymorphs, and Hydrates

Active pharmaceutical ingredients ("API's") are often produced as solids. Solids can exist in "crystalline" forms, "amorphous" forms, or a combination of the two. Exh. B, ¶ 31. A crystalline form is an arrangement where the molecules of the compound are ordered with a particular symmetry. *Id.* An amorphous form is an arrangement of the molecules of the compound that is not ordered and, therefore, does not have a particular symmetry. *Id.* The figure below compares amorphous benzene (left) and crystalline benzene (right).



The atoms or molecules of a compound in a crystal form are arranged in a repeating and ordered pattern, each pattern being made up of "unit cells" stacked in three-dimensional space to form the crystal. Exh. B, ¶ 32. In other words, the unit cell is the building block of the crystal.

Many pharmaceutical compounds can exist in different crystalline forms, also known as

"polymorphs". Exh. B, ¶ 33. This phenomenon is called "polymorphism". *Id.* These different crystalline forms consist of compounds that are all ordered, but each different "crystalline form" ("form" for short) has a different three dimensional arrangement of molecules or unit cell and, therein, a different symmetry. *Id.* The example below shows three different unit cells of three polymorphs of the same hypothetical compound.



Each unit cell's pink molecules are arranged differently as shown by solid and dotted lines. *Id.*

A further example is given in the figure below which shows different crystalline forms of terephthalic acid. Exh. B, ¶ 34. The figure illustrates that while the molecules of terephthalic acid are the same, the way in which they are ordered is different, as is the symmetry of the crystal. *Id.*



Different crystalline forms (often labeled Form A or I, B or II, etc.) can have widely varying properties, including different x-ray scattering, thermodynamic, and pharmacological properties. Exh. B, ¶ 35. Thus, different crystalline forms can yield widely different results when subjected to analytical methods. *Id.* A classic example of polymorphic differences is coal vs. diamonds (technically called allotropes because carbon is a single element, but the idea is the same as for polymorphs). Both are made of carbon, but because of their different crystalline forms, their properties are very different. *Id.*

"Solvates" are crystalline forms that contain both the API and solvent molecule(s). Exh. B, ¶ 36. Solvates can also exist as different polymorphs, typically called "pseudopolymorphs". *Id.* A "hydrate" is a type of solvate in which water molecules occupy regular positions in the crystal structure. *Id.* The prefix to the term "hydrate" in the name of a hydrate is used to denote the ratio of water molecules to compound molecules in the crystal.

### 4. X-Ray Powder Diffraction ("XRPD")

A key analytical method used in the pharmaceutical sciences to characterize and distinguish different crystalline forms is "x-ray powder diffraction" ("XRPD"). XRPD is a technique that results in a "powder pattern", which is a unique fingerprint of the material if the material is a crystalline form. Exh. B, ¶ 37. Because the XRPD pattern of a crystalline form (such as a polymorph) is unique to that form, XRPD can also distinguish one polymorph from another and can be used to identify whether a sample is pure or a mixture. *Id.* The figure below is a schematic of XRPD:



*Id.* X-rays are directed towards a sample of the crystal or amorphous form. When x-rays hit the atoms in the sample and bounce off in different directions, some of them hit the detector and are recorded. Exh. B, ¶ 38. "θ" is the angle between the x-ray beam and the sample. As θ is changed, the amount of x-rays that bounce off of the sample and hit the detector increases or decreases depending on the nature and arrangement of the atoms in the crystal. *Id.* The amount of x-rays that hit the detector is recorded as a function of θ (actually typically "2θ", since the x-ray tube is at an angle of 2θ with respect to the detector) and is generally reported as intensity.

*Id.* Intensity is important in characterizing the crystal structure of a polymorph. *Id.*

When an x-ray beam is directed on a powder of one or more polymorphs of a compound, the polymorph(s) diffracts the x-rays in a pattern characteristic of the polymorphic structure. Exh. B, ¶ 39. A diffraction pattern (a.k.a. "diffractogram") is the plot of the intensity of the diffracted x-rays (y-axis) against the angle of the detector ("2θ") (x-axis) as shown below. *Id.*



The 2θ value of the tallest point of each peak is the position of the peak, and the height of the peak is its intensity. The position of the atoms in the unit cell determines the peak positions, and the way in which the x-rays interact with those atoms determines the relative peak intensities. *Id.*

Each diffractogram of a particular polymorph or mixture of polymorphs of a compound exhibits a unique set of characteristic peaks. For example, '838 patent Figures 1 to 4, which differ from one another in the set of peak locations (on the x-axis) and their intensities (on the y-axis), allegedly are diffractograms of four different crystal forms of desvenlafaxine succinate.[1] Exh. A, col. 2, ll. 52-59; Exh. B, ¶ 40. The unique diffractogram of a particular polymorph or mixture is a characteristic, natural, and inseparable property, *i.e.,* an "inherent" property, of that polymorph or mixture. Exh. B, ¶ 41.

### 5. Melting Point/Endotherms

Another inherent property of a polymorph is its melting point and associated endotherm.

---

[1] However, '838 patent Figure 1 is a diffractogram of something other than pure Form I, such as a mixture of polymorphs of desvenlafaxine succinate. *See* footnote 2; Exh. B, ¶¶ 41, 52-57.

Differential scanning calorimetry ("DSC") is a well-established technique for measuring melting points. Exh. B, ¶ 42. In DSC, a sample is heated, the temperature is increased at a constant rate, and the amount of heat added or subtracted is measured as a function of temperature. *Id.* The heat flow is plotted on the y-axis against temperature on the x-axis, yielding a DSC profile. *Id.* When a sample melts, the heat flow difference first increases and, upon completion of melting, then decreases. This results in a shape termed an "endotherm" in the DSC profile. *Id.*

### B.     The Person of Ordinary Skill in the Art with Respect to the Patents-in-Suit

A person of ordinary skill in the art relevant to the patents-in-suit is a person who, at the time of the invention would have earned an advanced degree (*e.g.*, Master's degree, Ph.D., or foreign equivalents of either of the foregoing) in the field of pharmaceutical chemistry, organic chemistry, medicinal chemistry, chemical engineering, or pharmaceutics, and would have had at least several years of experience in active pharmaceutical ingredient development with particular experience in the research and development of salt forms of pharmaceutical products and the interface between pharmaceutical formulation, process chemistry, pharmaceutical research, and drug development, including analytical methodology, provided that the years of experience are commensurate with the level of degree obtained, *e.g.,* at least 1 to 2 years of experience for a person with a Ph.D. and at least 3 to 6 years of experience for a person with a Master's degree.

A person of ordinary skill in the art would typically work with a team that includes one or more other persons of skill in the art with respect to one or more other aspects with which the other person may have expertise and knowledge that was obtained through her educational, industrial, or academic experiences.

### IV.   ARGUMENT

The '838 patent asserted claims that include a disputed term read as follows:

5. The compound of claim 4 [crystalline desvenlafaxine succinate] *wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ (± 0.2• 2θ)* at 10.20, 14.91, 20.56, 22.13, 23.71, 24.60, and 25.79.

6. The compound of claim 4 [crystalline desvenlafaxine succinate] having an endotherm at *about* 131° C.

7. The compound of claim 4 [crystalline desvenlafaxine succinate] *having an X-ray powder diffraction pattern substantially the same* as that shown in FIG. 1.

8. The compound of claim 4 [crystalline desvenlafaxine succinate] *wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ (± 0.2° 2θ)* at 13.18, 14.04, 14.35, 14.66, 16.68, 17.67, 19.24, 25.13, and 31.78.

9. The compound of claim 8 *wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ (± 0.2° 2θ)* at 10.25, 13.18, 14.04, 14.35, 14.66, 16.68, 17.67, 19.24, 20.38, 20.56, 23.41, 23.78, 24.57, 25.13, 25.80, and 31.78.

10. The compound of claim 4 [crystalline desvenlafaxine succinate] having an endotherm at *about* 127° C.

11. The compound of claim 4 [crystalline desvenlafaxine succinate] *having an X-ray powder diffraction pattern substantially the same as* that shown in FIG. 2.

Roxane submits that the disputed claim terms should be construed as follows:

1.    *"wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ,"* which appears in claims 5, 8, and 9, should be construed as "wherein the compound exhibits an X-ray powder diffraction pattern having a complete and unique set of peaks having the reported locations and having intensities no lower than that of the characteristic peak with the lowest intensity in the table in the '838 patent specification for that set of characteristic peaks;"

2.    *"± 0.2° 2θ",* which appears in claims 5, 8, and 9, should be construed as "the recited peak position includes peak positions in a range from 0.20° 2θ less than the recited position to 0.20° 2θ greater than the recited position;"

9

3.     *"having an X-ray powder diffraction pattern substantially the same as that shown in FIG.,"* which appears in claims 7 and 11, should be construed as "having an X-ray powder diffraction pattern in which peak locations do not deviate more than ± 0.2° 2θ (as previously defined) and have substantially the same relative intensities as the peaks present in FIG.;" and

4.     *"about",* which appears in claims 6 and 10, should be construed as "± 1%".

## A.     The Law of Claim Construction

A patent claim points out particularly and claims distinctly that which the patent applicant regards as the invention. 35 U.S.C. § 111; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  The reason for this is two-fold:  first, to secure to the patentee all to which he is entitled, and second, to inform the public of what is still open to them.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). Claim interpretation is a question of law, *Id.* at 390, and, in that sense, is no different than the interpretation of written legal documents in general.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978-79 (Fed. Cir. 1995).  In claim construction, "the court establishes the scope and limits of the claim, interprets any technical or other terms whose meaning is at issue, and thereby defines the claim with greater precision than had the patentee."  *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999).

Meaning must be given to every element of the claim. *Union Water-Meter Co. v. Desper Products, Inc.*, 101 U.S. 332, 337 (1879).  When construing a patent claim, one should look first to the intrinsic evidence of record*, i.e.,* the patent itself including the claims, the specification, and the prosecution history.  *CVI/Beta Ventures, Inc. V. Tura LP*, 112 F.3d 1146, 1152 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998).

The words of the claim, including technical terms, are given their ordinary meaning to one skilled in the art unless it appears from the patent and file history that the words were used

differently by the inventors. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A court may rely on extrinsic evidence, but cannot use extrinsic evidence to arrive at a claim construction that is inconsistent with one that is mandated by the intrinsic evidence. *Key Pharmaceuticals v. Hercon Labs Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). Dictionary definitions may provide evidence of ordinary meanings. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1346 (Fed. Cir. 2003). However, a nonscientific dictionary may not be proper for defining a technical term. *See e.g. AFG Industries, Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247-48 (Fed. Cir. 2001). A court may consider evidence such as testimony or dictionaries to explain scientific principles, the meaning of technical terms, and terms of art in the patent and prosecution history. Such evidence can aid the court in coming to a correct conclusion as to the true meaning of the language in the patent. *Markman*, 52 F.3d at 980. Particularly, educational testimony may assist the court in understanding how a person of ordinary skill in the field, reading the patent, would understand the claim terms. *Id.* at 981. Furthermore, expert testimony and declarations are useful to confirm that the construed meaning is consistent with the denotation ascribed by those in the field of the art. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

Once the proper meaning of a term used in a claim has been discerned, that term normally has the same meaning for all claims in which it appears. *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 987 (1995).

## B. The '838 Patent Does Not Claim any Particular Polymorph – It Claims Compounds with Certain Properties

One overriding point that should be kept in mind when construing the '838 patent's asserted claims is that the patent does not claim any particular polymorphs, despite Plaintiffs' efforts to transform the claims to do so. Pfizer argues that "[a]ll four disputed claim terms

concern the '838 patent's 'polymorph claims' (asserted claims 5-11) ...." D.I. 321, Pfizer Opening Brief, p. 3. *See also Id.* at 8 ("However, a person of skill would also appreciate that not every 'characteristic peak' of a polymorph must be seen in a sample's XRPD pattern in order to conclude the sample contains that polymorph."); *Id.* at 9 ("However, persons of skill in the art appreciate that this range only applies to a sample that was tested in the same way, in the same lab, as a previously tested sample," "For that reason, persons of skill in the art would not conclude that a new sample of a compound is a different polymorph than a prior sample . . . simply because one or two of the peaks from the standard are not present in the sample's pattern within the ± 0.2° range," "The presence of a majority of the standard's characteristic peaks (e.g., the Form I peaks listed in Table 1) in the sample's pattern, along with the overall visual similarity of the standard and sample patterns, would cause a person of skill to conclude that the sample and the standard are the same polymorph."); *Id.* at 11 ("Although asserted claims 5, 6, and 7 do not expressly recite 'Form I,' the specification makes clear that they relate to that polymorph.")[2]; *Id.* at 16 ("Thus, a person of skill in the art would recognize the use [sic] the term 'characteristic peaks' in claims 5, 8, and 9, as a reference to a particular polymorph disclosed in the patent's specification." "Because the reference [*i.e.,* "characteristic peaks'"] is to a polymorph, rather than a list of peaks without context, a person of skill would not require a sample's XRPD pattern to exhibit every single 'characteristic peak' within 0.2° 2θ."); *Id.* at 17 ("Rather than seeking a one-to-one match of all characteristic peaks within 0.2° 2θ, a person of

---

[2] Actually, the peaks in claim 5 and Figure in claim 7 were from a mixture of different crystalline desvenlafaxine succinate polymorphs, not from a single one. Accordingly, claims 5 and 7 do not even claim a property of pure Form I. Rather, they encompass properties of a mixture of polymorphs. Exh. B, ¶¶ 48-53, 55-57. The same is true of claim 8, 9, and 11. *Id.* at 48, 54, 65.

skill would look at a sample's *overall* XRPD pattern and compare it to a reference pattern for that polymorph, which would include the peaks previously determined to be 'characteristic' of that form." "If the sample's pattern matched that of the reference, a person of skill would conclude that they were the same polymorph." "That result is at odds with the specification, which clearly correlates claim 5 with polymorph Form I, with accepted principles of claim construction." "Put another way, the claim [5] covers compounds that . . . represents [sic] the same polymorph as the reference."). Pfizer's arguments are misleading, and its proposed constructions of the disputed claim terms turn the '838 patent claims into the proverbial nose of wax. *See White v. Dunbar,* 119 U.S. 47, 51-52 (1886) ("Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may undoubtedly be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is, and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."). However, this is the only way that Pfizer can excuse the problems with its claims.

The '838 patent does not claim any specific polymorphs, although, its claims could have been written to do so. For example, there are no claims that read: "The compound crystalline desvenlafaxine succinate polymorph Form I [or Form II, II, or IV]." Rather, the '838 patent's asserted claims are directed to crystalline desvenlafaxine succinate having particular properties. Any construction that would have them claim a particular polymorph, rather than crystalline

desvenlafaxine succinate with certain specified properties, as the claims are written, must be incorrect. An alleged infringer must only determine whether her product has the claimed properties, *i.e.*, a certain set of characteristic peaks (claims 5, 8, and 9), a certain endotherm (claims 6 and 10), or a certain diffractogram (claims 7 and 11), here.

### C. The Term "Wherein the Compound Exhibits an X-ray Powder Diffraction Pattern Having Characteristic Peaks Expressed in Degrees 2θ" Requires Each Recited Peak Location and a Threshold Intensity

The term "wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ," which appears in '838 patent claims 5, 8, and 9, should be construed as "wherein the compound exhibits an X-ray powder diffraction pattern having a complete and unique set of peaks having the reported locations and having intensities no lower than that of the characteristic peak with the lowest intensity in the table in the '838 patent specification for that set of characteristic peaks." This construction is based upon the language of the claim itself as understood by one of ordinary skill in the art, the '838 patent specification (in which the '838 patent inventors used an intensity minimum to select which peaks rise to the level of a "characteristic peak"), and common sense.

Pfizer contends that this construction ignores the word "characteristic". D.I. 321, Pfizer Opening Brief, p. 2. ("Defendants' proposals fail to account for the critical word in the term: 'characteristic.'"). Pfizer further contends that "Defendants also seek to graft a peak intensity limitation onto the claims, where the intrinsic evidence does not support such a limitation and doing so would be at odds with the regular practice in the art." *Id.* at 2, 15. This is surprising since Roxane's construction, not Pfizer's, actually assigns meaning to "characteristic peak".

Those skilled in the art understand that each distinct peak in a diffractogram is defined by two main characteristics – its location (the angle of the detector, "2θ") and its height (the

intensity of the diffracted X-rays).  Exh. B, ¶ 39.  The peaks, as defined by their locations and

their corresponding relative intensities, form a pattern that is displayed as an irregular line with a

baseline (once noise is disregarded) and spikes from that baseline.  *Id.*  This is how an XRPD

pattern is used to distinguish different crystal forms or mixtures from one another.  *Id.*

A diffractogram typically displays many peaks; however, not all are "characteristic

peaks" according to the '838 patent.  One could include every peak above the noise in a

diffractogram in a set of "characteristic peaks" since a compound's or mixture's individual

diffractogram is unique to that compound or mixture.  That is not what the '838 patent inventors

did, however.  They selected only certain peaks in each diffractogram to be included in the set of

"characteristic peaks" for that compound (or most likely in this case a mixture).  *See* footnote 2;

Exh. B, ¶¶ 41, 52-57.  They did this by using a relative intensity minimum, as shown in each

table in the '838 patent that corresponds to the characteristic peaks in a claim. For example, with

respect to claim 5 (which corresponds to Exh. A, Table 1, col. 4, ll. 50-63) the '838 patent

inventors only included as "characteristic peaks" those peaks in the corresponding diffractogram

(Exh. A, Figure 1) that had a relative intensity of at least 11.  With respect to claims 8 and 9

(which corresponds to Exh. A, Table 2, col. 5, ll. 25-45) the '838 patent inventors only included

as "characteristic peaks" those peaks in the corresponding diffractogram (Exh. A, Figure 2) that

had a relative intensity of at least 10.  With respect to claim 12 (which derives from Exh. A,

Table 3, col. 6, ll. 45-65), the '838 patent inventors only included as "characteristic peaks" the

three peaks with the lowest relative intensity in the table (*i.e.,* at least 10).  With respect to claim

13 (which corresponds to Exh. A, Table 3, col. 6, ll. 45-65) the '838 patent only included as

"characteristic peaks" those peaks in the corresponding diffractogram (Exh. A, Figure 3) that had

a relative intensity of at least 10.  With respect to claims 15 and 16 (which correspond to Exh. A,

Table 4, col. 7, ll. 20-45) the '838 patent only included as "characteristic peaks" those peaks in the corresponding diffractogram (Exh. A, Figure 4) that had a relative intensity of at least 10. The '838 patent inventors clearly used a relative intensity cut-off to select and distinguish "characteristic peaks" from other peaks above the noise. Exh. B, ¶ 78.

The importance of peak location coupled with intensity (*i.e.*, a pattern) is clearly demonstrated when one examines the term "pattern having characteristic peaks" with respect to claim 12. Claim 12 requires a "pattern having" three "characteristic peaks" – 13.74, 22.55, and 32.42. Exh. A, col. 32, ll. 1-4. Their intensities are given in '838 patent Table 3. Exh. A, 6, ll. 41-67. However, peaks at each of these three "characteristic peak" locations for alleged Form III, as recited in claim 12, also appear in '838 patent diffractogram for alleged Form IV within ± 0.20° 2θ. *See* Exh. A, Figure 4. The differences between the characteristic peaks at locations 13.74, 22.55, and 32.42 in claim 12 (directed to Form III) and those peaks at the same locations in Figure 4, 13.69, 22.55, and 32.42 ± 0.20° 2θ (which is directed to Form IV) is that one of them (the peak at 32.42 ± 0.20° 2θ) is clearly less intense in Form IV (relative intensity ~4) than it is in Form III (relative intensity of 10). The peak at 13.74/13.69 has relative intensities of 11 and 10 in Forms III and IV, respectively, and the peak at 22.55 has relative intensities of 11 and 12 in Form III and IV, respectively. Therefore, in order for the claim 12 peaks to be a "pattern having characteristic peaks," *i.e.*, peaks unique to only one polymorph or mixture, intensities must be considered. When intensity is considered, the Form III peak at 32.42, with a relative intensity of 10, is different than the Form IV peak at 32.42 ± 0.20° 2θ with a relative intensity of ~ 4, making the complete set of characteristic peaks in claim 12 unique to Form III rather than common to both Forms III and IV. In other words, the set of "characteristic peaks" in claim 12 is unique to one polymorph (*i.e.*, Form III) or mixture only when intensities are included in the definition of

"pattern having characteristic peaks." Exh. B, ¶ 79.

Extrinsic evidence corroborates Roxane's construction. Intensity is important and considered, despite what Pfizer's expert, Dr. Chayll, says. *See e.g.* D.I. 321, Pfizer Opening Brief, Exhibit C, Chyall Dec, ¶¶ 25, 29. Remington's Pharmaceutical Sciences explains why. "In most cases little information can be gleaned from a knowledge of the unit-cell dimensions alone. In order to learn about the crystal and molecular structure it is necessary to consider the intensities of the Bragg reflections." ERIC J. LIEN, REMINGTON'S PHARMACEUTICAL SCIENCES 173 (ALFONSO R. GENNARO ed., MACK PUBLISHING CO. 1990) (1885) (attached as Exhibit C). This is contrary to Pfizer's unsubstantiated assertion that "... chemists do not typically rely on intensity comparisons to determine whether two samples correspond to the same polymorph." D.I. 321, Pfizer Opening Brief, p. 6.

Finally, the '838 patent inventors could have chosen to express the results of their diffractograms in a term other than "pattern of characteristic peaks," such as d-spacing, which is derived from an XRPD by using Bragg's Law, but they did not. Exh. B, ¶ 83.

Pfizer argues that intensity should be disregarded. For example, Pfizer states that "[t]here is no express intensity limitation in the language of claims 5, 8, and 9, and no suggestion that any such limitation is contemplated" and that "[t]he inventors were clearly aware of the issue of peak intensity, as they reported it in their Tables and addressed the widely varying intensities between Tables 1 and 6, yet they did not include such limitation in the claims." D.I. 321, Pfizer Opening Brief, p. 19. This is incorrect. A peak is two dimensional – one dimension is its location and the other is its intensity. Exh. B, ¶ 40. This claim term does not disclaim either dimension. Pfizer is attempting to read a negative limitation in to the claim term *(i.e.,* transforming "peak" into, "peak, excluding its intensity"). This is impermissible. *See* Manual of Patent Examining Procedure § 2173.05(i) ("The mere absence of a positive recitation is not a basis for exclusion.").

Furthermore, the inventors did include intensity in their definition of "characteristic peak". For example, the patent expressly labels the combination of locations and intensities in Table 1 as "Characteristic XRPD Peaks." Exh. A, col. 4, ll. 50-51. Pfizer admits this. *See* D.I. 321, Pfizer Opening Brief, p. 8 ("Table 1 lists the angles at which prominent peaks are present in Figure 1 and compares the intensities of those peaks to the most intense peak, which appears at 25.79 degrees 2θ. The patent describes the listed peaks as 'characteristic of Form I'").

Pfizer faults Roxane's construction because it limits "the claims to compounds whose XRPD patterns exhibit every single peak listed within 0.2° 2θ ...."  D.I. 321, Pfizer Opening Brief, p. 15.  But that is precisely what claims 5, 8, and 9 require.  If the claims were construed otherwise, the limitation to the missing peak would be rendered meaningless.  Meaning must be given to every claim limitation.  *Union Water-Meter*, 101 U.S. at 337.

Pfizer argues that "[u]nder Pfizer's construction, claim 5 covers compounds that are 'identifiable by comparison to a reference X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ at' the angles listed in each claim.  Put another way, the claim covers compounds that, when compared to a reference pattern having the characteristic peaks of the claim (for example, Figure 1 of the patent), represents the same polymorph form as the reference."  D.I. 321, Pfizer Opening Brief, p. 17; *see also Id.*, emphasis in original ("Rather than seeking a one-to-one match of all characteristic peaks within 0.2° 2θ, a person of skill would look at a sample's *overall* XRPD pattern and compare it to a reference pattern for that polymorph, which would include the peaks previously determined to be 'characteristic' of that form. [citation omitted]  If the sample's pattern matched that of the reference, a person of skill would conclude that they were the same polymorph.").  In other words, Pfizer is instructing a competitor evaluating claims 5, 8, and 9 to look at a standard XRPD diffractogram that has the characteristic peaks of claim 5 (which Pfizer says is '838 patent Figure 1) or 8 or 9, and then compare that to the alleged infringing sample's diffractogram.  Even if the alleged infringing product's diffractogram were missing these claims' recited peaks, Pfizer would find infringement under these "characteristic peak" claims if Pfizer thought the diffractograms were nevertheless similar.  This is paradoxical and circular.  It cannot be correct.

Pfizer's construction must also be wrong because it conflates claims 5 and 7. Claim 7 requires a comparison with Figure 1, but claim 5 does not. However, Pfizer's construction has both claims 5 and 7 requiring that comparison. Pfizer's construction also results in claims 5 and 7 essentially being reduced to read "O-desmethylvenlafaxine succinate polymorph Form I," which it does not, as explained above. A claim construction providing either result cannot be correct. The same is true for claims 8, 9 and 10 for Form II.

Pfizer's reliance on *AstraZeneca AB v. Dr. Reddy's Labs. Inc*., No. 11-2317, 2013 U.S. Dist. LEXIS 62149 (D.N.J. Apr. 30, 2013) is misplaced. D.I. 321, Pfizer Opening Brief, pp. 17-18. The claim term in *AstraZeneca* was not the same as that of '838 patent claim 5. The *AstraZeneca* claim term read "… wherein the compound is characterized by the following major peaks in its X-ray diffractogram" (*id.* at *27), not "exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ (± 0.2° 2θ)." The *AstraZeneca* court found that requiring an exact match of peaks was too rigid because it did not allow for "slight experimental error," and the court provided a construction that would account for such error. *Id.* at *27-28. Such a construction is not necessary here and would impermissibly read an extraneous limitation into the claim, because the claim already expressly includes a term that accounts for experimental error, *i.e.*, "(± 0.2° 2θ)." *See Stumbo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007).

### D. The Term "± 0.2° 2θ" Is the Range from 0.20° 2θ Less than to 0.20° 2θ Greater than the Recited Position

The term "± 0.2° 2θ," which appears in '838 patent claims 5, 8, and 9, should be construed as "the recited peak position includes peak positions in a range from 0.20° 2θ less than the recited position to 0.20° 2θ greater than the recited position. This term is what the '838 patent inventors expressly decided to include in their claims to account for any variation among peak

positions and diffractograms. The "0" is added to the 100th position after the decimal to maintain arithmetic precision. U.S. Pharmacopeia agrees that the terminal "0" should be there. D.I. 321, Pfizer Opening Brief's Exh. C's Exh. F.

If the terminal "0" were not part of the interpretation of ($\pm$ 0.2° 2θ), taking into account rounding would expand the term ($\pm$ 0.2° 2θ) to mean anything from $\pm$ 0.16° 2θ to $\pm$ 0.24° 2θ because a value of 0.16 would be rounded up to 0.2 and a value of 0.24 would be rounded down to 0.2. This would lead to uncertainty when a competitor attempted to determine whether its product would infringe '838 patent claim 5. Accordingly, claims 5, 8, and 9 do not include peak positions outside of the ($\pm$ 0.20° 2θ) range.

Pfizer argues that this term should be construed in conjunction with the previous term, "wherein the compound exhibits an X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ." D.I. 321, Pfizer Opening Brief, pp. 2, 15. This is an argument with no practical effect on the ultimate construction.

Pfizer admits that "[t]he $\pm$ 0.2° 2θ range is a commonly used standard that permits persons of skill in the art of XRPD testing to assess whether two peaks from different sample analyses that appear to correspond but vary by small amounts are, in fact, the same peak." D.I. 321, Pfizer Opening Brief, p. 8. However, Pfizer then paradoxically attacks that term as virtually meaningless. *See Id*. at 9 ("However, persons of skill in the art appreciate that this range only applies to a sample that was tested in the same way, in the same lab, as a previously tested sample." "For that reason, persons of skill in the art would not conclude that a new sample of a compound is a different polymorph than a prior sample (often referred to as a 'reference standard') simply because one or two of the peaks from the standard are not present in the sample's pattern within the $\pm$ 0.2° range."). The term has meaning in the art (*i.e.*, $\pm$ 0.20°), and

the '838 patent inventors chose to use it in their claims. Meaning must be given to every claim limitation. *Union Water-Meter*, 101 U.S. at 337.

E. **The Term "Having an X-Ray Powder Diffraction Pattern Substantially the Same as that Shown in FIG." Requires Peak Locations within ± 0.2° 2θ and Substantially the Same Intensities**

The term "having an X-ray powder diffraction pattern substantially the same as that shown in FIG.," which appears in '838 patent claims 7 and 11, should be construed as "having an X-ray powder diffraction patterns in which peak locations do not deviate more than ± 0.2° 2θ (as previously defined in section III.D., above) and have substantially the same relative intensities as the peaks present in FIG." This definition comports with the express definition that the '838 patent inventors provided in their specification. Exh. A, col. 3, ll. 40-43 ("The term 'substantially the same' when used to describe X-ray powder diffraction patterns, is meant to include patterns in which peaks are within a standard deviation of no more than ± 0.2° 2θ."). *See Vitronics.*, 90 F.3d at 1582, ("The specification acts as a dictionary when it expressly defines terms used in the claims …."). *See* Exh. B, ¶ 89.

This claim term should also require substantially the same relative intensities for the corresponding peaks. Again, peaks are two dimensional (*i.e.*, location and intensity). The '838 patent specification indicates the importance of accounting for intensity. For example, for convenience of interpreting Figures 1 and 2, as recited in claims 7 -61 and and 11, respectively, the '838 patent states that "[p]eak locations and *intensities* for the [x-ray powder diffraction] pattern in FIG. [1 or 2] are provided in Table [1 or 2] below." Exh. A, col. 4, ll. 47-49; col. 5, ll. 22-24 (emphasis added); *see also* Exh. A, Table 1, col. 4, ll. 50-61 and Table 2, col. 5, ll. 26-44. The '838 patent inventors took into account relative intensities when characterizing the diffractograms, and, accordingly, relative intensities should part of the term "substantially the same as" when defining the metes and bounds of these claims. *See* the discussion in Section

III.C., above, regarding the importance of considering relative intensity in construing the claims of the '838 patent.

Pfizer argues that "[t]hat numerical range [*i.e.*, ± 0.2º 2 θ] does not appear anywhere in claims 7 and 11, and Defendants have identified no reason to equate the commonly used claim term 'substantially the same' with a specific numerical range of peak positions." D.I. 321, Pfizer Opening Brief, p. 20; *see also Id.* at 2 ("Defendants' proposed construction of the 'substantially the same as' term seeks to add numerical peak position and intensity limitations to the term"). Therefore, Pfizer accuses Roxane of attempting to read ± 0.2º 2θ into those claims in violation of the doctrine of claim differentiation, making claims 5, 8, and 9 the same as claims 7 and 11. *Id.* at pp. 20-21.

Pfizer is wrong for two reasons. First, the '838 patent specification uses that numerical range in its definition of "substantially the same as." Second, the doctrine of claim differentiation is not violated. Claims 5, 8, and 9 require only the recited peaks, while claims 7 and 11 require substantially the same diffractogram. The claims are different, despite Pfizer's protest to the contrary. *See* D.I. 321, Pfizer Opening Brief, pp. 20-21.

Actually, it is Pfizer's construction of claims 5, 8, and 9 that violates the doctrine of claim differentiation since Pfizer's construction requires a comparison of entire diffractograms in claims 5, 8, and 9, as well as in claims 7 and 11. *See Id.* at 17 ("Rather than seeking a one-to-one match of all characteristic peaks within 0.2º 2θ, a person of skill would look at a sample's *overall* XRPD pattern and compare it to a reference pattern for that polymorph, which would include the peaks previously determined to be 'characteristic' of that form. [citation omitted] If the sample's pattern matched that of the reference, a person of skill would conclude that they were the same polymorph." "Under Pfizer's construction, claim 5 covers compounds that are 'identifiable by

comparison to a reference X-ray powder diffraction pattern having characteristic peaks expressed in degrees 2θ at' the angles listed in each claim. Put another way, the claim covers compounds that, when compared to a reference pattern having the characteristic peaks of the claim (for example, Figure 1 of the patent), represents the same polymorph form as the reference."). This is another reason why Pfizer's construction of claims 5, 7-9, and 11 must be incorrect.

Pfizer also argues that this claim term should not be construed because "substantially" means "approximately" or "largely". *Id.* at 20. This ignores the '838 patent specification and, therefore, cannot be correct.

The cases relied upon by Pfizer are not on point, either. Contrary to Pfizer, the facts in *Shire LLC v. Amneal Pharm., LLC*, No. 11-3781, 2013 U.S. Dist. LEXIS 111773 (D.N.J. Aug. 8, 2013), are not "highly similar". D.I. 321, Pfizer Opening Brief, p. 21. The *Shire* court construed "X-ray powder diffraction pattern substantially as show in FIG. 77" to mean "X-ray powder diffraction pattern approximately as shown in FIG. 77" because there was "no explicit construction of the term 'substantially' in the claims, specification, or prosecution history" of the patent-at-issue. *Shire*, 2013 U.S. Dist. LEXIS 111773, at *20-23. Here, the '838 patent specification provides explicit and implicit construction of the term "substantially the same," as explained above.

Pfizer wants to exclude intensities from "substantially the same" based upon *Bristol-Myers Squibb Co. v. Apotex, Inc.*, No. 10-5810, 2013 U.S. Dist. LEXIS 44481, at *47-52 (D.N.J. Mar. 28, 2013). D.I. 321, Pfizer Opening Brief, pp. 21-22. The reason that the *BMS* court construed the term "characterized by an x-ray powder diffraction pattern substantially in accordance with that shown in FIG 1" as "not taking into account the exact order of intensity of the peaks" (*BMS*, 2013 U.S. LEXIS 44481, at *47) was that the specification of the *BMS* patent

specifically instructed that "the exact order of intensity should not be taken into account." *Id.* at *48 quoting U.S. Patent No. 7,491,725, col. 41, ll. 65-67. Here, the opposite is true. The '838 patent specification does not provide instructions to ignore the intensities in Figures 1 and 2; nor does the intrinsic and extrinsic evidence, as explained above. Rather, the '838 patent inventors clearly demonstrated that relative intensities were important by specifically including them in their specification.

The only evidence Pfizer cites in support of the negative limitation, *i.e.*, "excluding relative intensities," that it proposes to read into "substantially the same as" is extrinsic evidence, the Chyall Declaration. *See* D.I. 321, Pfizer Opening Brief, pp. 21-22, Exh. C's Exh. F. However, even that evidence fails. The pertinent portion of D.I. 321, Pfizer Opening Brief's Exh. C's Exh. F specifically states:

> Agreement between sample and reference should be within the calibrated precision of the diffractometer for diffraction angel ($2\theta$ values should typically be reproduced to ± 0.10 or 0.20 degrees), while relative intensities between sample and reference may vary up to 20 percent.

Pfizer's own evidence even shows that "substantially the same" must include relative intensities. Accordingly, the Court should reject Pfizer's construction and adopt Roxane's.

**F.  The Term "About" Should Be Construed According to the Specification to Mean "± 1%"**

The term "about", which appears in '838 patent claims 6 and 10, should be construed as "± 1%". The term "about" should differentiate claims 6 and 10 from one another. In other words, the endotherms should not overlap. Therefore, the term "about" should not expand the recited endotherm to a range of endotherms that overlaps the range of endotherms claimed in another '838 patent claim. The '838 patent expressly defines "about" under the heading "Definitions" to mean "within 10%, preferably within 5%, and more preferably within 1% of a

given value or range. Alternatively, the term 'about' means within an acceptable standard error of the mean, when considered by one of ordinary skill in the art." Exh. A, col. 3, ll. 27-31. The table below illustrates the ranges of endotherms of claims 6 and 10 if "about" were to mean ± 10%, 5%, or 1%.

| Claimed Endotherm (Claim Number) | Range at ± 10% | Range at ± 5% | Range at ± 1% |
|---|---|---|---|
| 131° C (claim 6) | 117.9 - 144.1° C | 124.45– 137.55° C | 129.69 – 132.31° C |
| 127° C (claim 10) | 114.3 – 139.7° C | 120.65 – 133.35° C | 125.73 – 128.27° C |

The only column in which the ranges do not overlap with one another is the ± 1% column. Therefore, the term "about" in endotherm claims 6 and 10 should mean ± 1%.

Pfizer argues that the term "about" should not be construed because it is a "simple" word and "[c]ourts routinely decline to add additional limitations to this common word." D.I. 321, Pfizer Opening Brief, pp. 22-23; *see also Id.* at 3. Pfizer again ignores that the '838 patent inventors chose specifically to define this term in their patent specification. Their definition should not be ignored.

Again, the patents-at-issue in the cases relied upon by Pfizer did not include a specific definition of "about". Therefore, in *Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556 (Fed. Cir. 1994), the court construed "about" in accordance with its ordinary meaning because "[t]he specification and prosecution history do not support the argument that the inventors used this term differently from its ordinary meaning," (*id*. at 1561), and in *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), the court construed "about" to mean "approximately" because the patentee failed "to redefine 'about' to mean 'exactly' in clear enough terms." *Id*. at 1370. That is not the case with the '838 patent.

Pfizer also relies upon *UCB, Inc. v. KV Pharm. Co.*, No. 08-223, 2009 WL 2524519 (D. Del. Aug. 18, 2009). However, *UCB* actually supports Roxane's construction. The *UCB* court followed *Pall Corp. v. Micron Separations,* 66 F.3d 1211 (Fed. Cir. 1995) and found that the intrinsic evidence should be considered when construing "about". See *Pall,* 66 F.3d at 1217 ("The word 'about' does not have a universal meaning in patent claims, and … the meaning depends on the technological facts on the particular case." Thus, a court should "consider how the term … was used in the patent specification, the prosecution history, and other claims. It is appropriate to consider the effects of varying the parameter, for the inventor's intended meaning is relevant."). Here, the '838 patent inventors' intended meaning for "about" is written in their specification.

Accordingly, the Court should reject Pfizer's construction and construe the term "about" in claims 6 and 10 to mean "± 1%".

## V. CONCLUSION

For the foregoing reasons, Roxane respectfully requests that this Court adopt Roxane's proposed constructions as set forth above.

SMITH KATZENSTEIN & JENKINS LLP

*/s/ Neal C. Belgam*
Neal C. Belgam (# 2721)
800 Delaware Avenue, Suite 1000
P.O. Box 410
Wilmington, DE 19899
(302) 504-1688
nbelgam@skjlaw.com

*Attorneys for Roxane Laboratories, Inc.*

May 28, 2014

OF COUNSEL:

TROUTMAN SANDERS LLP
Joseph R. Robinson
joseph.robinson@troutmansanders.com
Robert Schaffer
robert.schaffer@troutmansanders.com
Heather Morehouse Ettinger
heather.ettinger@troutmansanders.com
405 Lexington Avenue
New York, NY 10174
(212) 704-6000

TROUTMAN SANDERS LLP
Matthew D. Murphey
matt.murphey@troutmansanders.com
5 Park Plaza, Suite 1400
Irvine CA 92614
(949) 622-2700